UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL SCHIRO,                           CASE NO. 6:06cv-279-ORL31J
                                          **DISPOSITIVE MOTION**
            Plaintiff,

vs.

SOUTHERN PRINTING, INC., and
PAUL COWART,

            Defendants.
_____/

## DEFENDANTS' MOTION FOR SUMMARY FINAL JUDGMENT
## AND SUPPORTING MEMORANDUM OF LAW

The Defendants, SOUTHERN PRINTING, INC. ("Southern Printing"), PAUL
COWART and PAULA COWART, pursuant to Fed. R. Civ. P. 56 and Local Rule 3.01, move
for summary final judgment against Plaintiff, Michael Schiro ("Schiro").  Schiro, a former
employee of Southern Printing, alleges in a Second Amended Complaint served September 25,
2006 that Defendants requested that he take a polygraph examination, that he was subsequently
suspended from employment, and ultimately discharged.  He alleges that the request that he take
a polygraph examination violated the Employee Polygraph Protection Act of 1988, 29 U.S.C.
§2001, et seq. ("EPPA"), and that his discharge constituted unlawful discrimination and
retaliation against him under EPPA.  He seeks damages consisting of back pay and front pay, and
damages for alleged emotional pain and suffering and loss of dignity.  As is conclusively shown
by record evidence,[1] however, there is no issue of material fact, and Defendants are entitled as a
matter of law to summary final judgment on all issues.

_____

[1] Citations in the following Statement of Undisputed Facts ("SOF") are to the Affidavits of Paula
L. Cowart (PC Aff. ¶___) and Jeff Cowart (JC Aff. ¶___), the sworn deposition of Schiro (Dep.
___), and Schiro's three complaints.

## STATEMENT OF UNDISPUTED FACTS

1.  Southern Printing is located in Longwood, Seminole County, Florida, and is in the business of commercial printing. PC Aff. ¶ 2.

2.  Paula L. Cowart ("Paula Cowart") is President and soul shareholder of Southern Printing, a Florida corporation. PC Aff. ¶¶ 1-2.

3.  Schiro was an employee of Southern Printing from on or about April 20, 2005 until he was discharged on January 27, 2006. PC Aff. ¶¶ 4, 15-16.

4.  Schiro was a stripper at Southern Printing. PC Aff. ¶ 4.

5.  Jeff Cowart, husband of Paula Cowart, is an employee of Southern Printing and manages its production work. PC Aff. ¶ 3.

6.  Paul Cowart, Paula Cowart's father, is also a full-time employee, assists Jeff Cowart and has other duties. Id.

7.  Paul Cowart has no management or supervisory duties or authority on behalf of Southern Printing, and has not had such at any time material to this case. Id.

8.  Schiro filed an initial Complaint on March 6, 2006 in which he alleged that the Defendants requested that he take a polygraph examination, that he refused to take such examination, and that he was suspended and discharged "for refusing to submit to a polygraph test." Complaint, ¶¶ 8-10, 17.

9.  In the March 6, 2006 Complaint the Defendants were Southern Printing and Paula Cowart. See Complaint.

10. On March 14, 2006 Schiro filed an identical Amended Complaint, except that Paul Cowart was substituted as an individual defendant in place of Paula Cowart. See Amended Complaint.

2

11.    After the taking by Defendants of Schiro's Deposition on August 29, 2006, a Second Amended Complaint was filed which changes the theory of the action by alleging that Defendant requested that Schiro take a polygraph examination, and that he was suspended and fired for no clear reason alleged in the Complaint: in paragraph 17 Schiro alleges that the "discharge, discipline and discrimination against Plaintiff by the Defendants in retaliation to Defendants' request that Plaintiff take a polygraph examination and Plaintiff not taking a polygraph examination was and is in violation of 29 U.S.C. §2002(4)". See Second Amended Complaint, served September 25, 2006.

12.    Paula Cowart made the decision to hire Schiro.  PC Aff. ¶ 5.

13.    Schiro's girlfriend, Tammy Channin ("Channin"), had been employed at Southern Printing since October, 2003.  Id.

14.    Channin introduced Schiro to Southern Printing and Paula Cowart.  Id.

15.    Schiro and Channin were both married to others, but were boyfriend and girlfriend, and lived with each other at all times material to this case.  Id.

16.    The matter set forth in statement 15 above were all generally known in Southern Printing's workplace by the employees at all times during Schiro's employment.  Id.

17.    Southern Printing is a small, one-site workplace.  Id.

18.    Before Paula Cowart and Southern Printing hired Schiro, Schiro, Paula Cowart and Channin met at Paula Cowart's home.  PC Aff. ¶ 6.

19.    Paula Cowart expressed to Schiro and Channin her reservations about having a couple known to be such working in the same small workplace.  Id.; Dep. 18.

3

20.     Southern Printing, through Paula Cowart, hired Schiro despite her reservations because Southern Printing needed an employee with skills Schiro and Channin represented Schiro had. PC Aff. ¶ 6.

21.     During the week beginning on Monday, January 16, 2006 there were two work-related incidents involving Channin and Schiro which Paula Cowart and Southern Printing considered inappropriate. PC Aff. ¶¶ 7-8; JC Aff. ¶ 3; Dep. 21-26.

22.     The first, on January 16, 2006, consisted of Paula Cowart's having instructed an employee, Karmen McLees, to tell Channin on her behalf to perform a certain task and have it done by a certain day. PC Aff. ¶ 7.

23.     Later that day, when Paula Cowart arrived at Southern Printing, the task had not been done, and Paula Cowart spoke to Channin about that in a critical manner and received what she considered an impertinent answer from Channin. Id.

24.     Schiro interrupted his own work and intervened in the situation for the purpose of calming Channin, and Paula Cowart considered that to be inappropriate interference on his part. Id.

25.     On January 19, 2006 Jeff Cowart was required to and did instruct and assist Channin on a project for which she was responsible. JC Aff. ¶ 3; PC Aff. ¶ 8.

26.     Channin expressed displeasure and became visibly and vocally upset over the involvement of Jeff Cowart. Id.

27.     Schiro became involved in the situation to comfort Channin. Id.; Dep. 21-22.

28.     Paula Cowart was aware of that situation as well and of Schiro's involvement in it, and considered his involvement to have been inappropriate. JC Aff. ¶ 3; PC Aff. ¶ 8.

4

29.     At the end of that work day Schiro asked Paula Cowart "are you guys mad at Tammy"? PC Aff. ¶ 8.

30.     There were occasions during paid working time where Channin would come to Schiro "upset" and Schiro would take her outside for "a smoke" and would "calm her down". Dep. 20-21, 24.

31.     Paula Cowart was aware of the January 19, 2006 incident and other similar conduct of Schiro during work. PC Aff. ¶ 8.

32.     Most of the Southern Printing employees during the period which included January, 2006 had keys to the workplace so that they could work during evenings or weekends if required or if they chose to do so. PC Aff. ¶ 9.

33.     Southern Printing was very busy during that time, and some evening and weekend work was taking place. Id.

34.     Schiro was among those who had keys to the workplace and he therefore had unrestricted access during night and weekend hours to the shop where work is performed. Id.; Dep. 28, 31-32; JC Aff. ¶ 3.

35.     Channin was out of state on Friday and Saturday, January 19 and 20, 2006. Dep. 32; PC Aff. ¶ 11; JC Aff. ¶ 7.

36.     Early Saturday morning, January 21, 2006 Jeff Cowart was in the production area. JC Aff. ¶ 2; PC Aff. ¶ 10.

37.     Jeff Cowart discovered that an essential machine, called the Cutter, was inoperable. Id.

38.     The Cutter is integral to the operation of Southern Printing's workplace. Dep. 31.

39.     Jeff Cowart summoned a repair person, Brian Kempfer ("Kempfer"), of Brian Kempfer Electronics, who came that morning to repair the Cutter. JC Aff. ¶ 2; PC Aff. ¶ 10.

40.     Kempfer opened the Cutter, and showed Jeff Cowart where two wires had been neatly cut. Id.

41.     To cut the wires, someone with knowledge of Southern Printing's operation had to open a closed panel fastened with screws. JC Aff. ¶ 2.

42.     Jeff and Paula Cowart saw the wires, and it was apparent to each that the wires had been severed intentionally, instead of having deteriorated and come apart naturally. Id.; PC Aff. ¶ 10.

43.     Schiro acknowledged that the wires had been cut and that the act had to have been intentional. Dep. 40-41.

44.     Jeff Cowart reported the cut wires to Paula Cowart on January 21, 2006, telling her also that Kempfer told him that the good news was that the Cutter could be easily repaired, the bad news was that "someone was out to get us". JC Aff. ¶ 2; PC Aff. ¶ 10.

45.     Kempfer's invoice shows that the repair cost $150.00, and that Kempfer had stated that the wires had been cut. Id., and Exhibit 1 to PC Aff.

46.     Jeff Cowart suspected Schiro of having committed the sabotage, partly because Schiro had independent access to the shop, but also because of recent incidents during work when Schiro had interrupted his own work to calm or comfort his girlfriend, Channin, over work-related incidents, including one on January 18, 2006  when Channin had believed her work had been criticized by Jeff Cowart and had become visibly and vocally upset. JC Aff. ¶ 3.

47.     Jeff Cowart reported to Paula Cowart that he personally believed Schiro had committed the sabotage. JC Aff. ¶ 4.

48.     Paula Cowart suspected Schiro of having committed the sabotage as soon as she heard of it, partly because he had had access the previous Friday evening to the workplace, but mainly because of the semi-unpleasantness which had occurred twice during the preceding week involving Schiro and Channin. PC Aff. ¶ 11.

49.     Supporting Paula Cowart's suspicion about Schiro's involvement were the facts that she personally knew all the employees, that no employees other than Channin and Schiro had had any recent negative interaction with management, and that Channin was out of state the entire relevant weekend. Id.

50.     On Sunday, January 22, 2006 Paula Cowart instructed Jeff Cowart to telephone Schiro and instruct him not to come to work at the usual time, 7:00 a.m., but instead to report to him and Paul Cowart at 9:00 a.m. on Monday, January 23. JC Aff. ¶ 4; PC Aff. ¶ 12.

51.     Schiro did report to Jeff Cowart and Paul Cowart at or about 9:00 a.m. on January 23, 2006. JC Aff. ¶ 5; PC Aff. ¶ 12.

52.     Jeff Cowart reported to Paula Cowart that he and Paul Cowart had confronted Schiro with the issue of whether he, Schiro, had committed the sabotage, and that they had told him that he was suspected. JC Aff. ¶ 5; PC Aff. ¶ 13.

53.     Jeff Cowart stated to Paula Cowart that Schiro had offered to take a polygraph test. Id.

54.     Jeff Cowart told Paula Cowart that his reply to Schiro about that had been that he did not know about that, and that he would have to check into it. Id.

55.     Thereafter Schiro was sent home. PC Aff. ¶ 14.

7

56.      Paula Cowart, Jeff Cowart and Paul Cowart investigated the sabotage as best they could, but were not able to find conclusive evidence that any particular person had committed it. JC Aff. ¶ 7.

57.      The investigation ended when Paula Cowart made the decision on January 27, 2006 to discharge Schiro.  JC Aff. ¶ 8.

58.      On Friday, January 27, 2006 Paula Cowart, after having considered the matter, decided to discharge Schiro.  PC Aff. ¶ 15.

59.      The decision to discharge Schiro was exclusively that of Paula Cowart.  Id.; JC Aff. ¶ 8.

60.      No one else had authority to make the decision to discharge Schiro.  PC Aff. ¶ 15.

61.      No one else participated in the decision to discharge Schiro.  Id.

62.      The primary reason of Southern Printing and Paula Cowart for discharging Schiro was that Paula Cowart believed (and continues to believe) that it had been Schiro who had cut the wires in the Cutter.  Id.

63.      The secondary reason for discharging Schiro was that Paula Cowart was tired of and wanted to put an end to the complications which had resulted from his relationship with Channin, two examples of which had occurred during the week immediately preceding.  Id.

64.      There were no other reasons for the decision of Southern Printing to discharge Schiro.  Id.

65.      Schiro claims in this action that he was discharged because Paula Cowart believed that he had committed the sabotage.  Dep. 12-13.

66.      Schiro states that the reason he was fired by Southern Printing was that Paula Cowart thought he had done damage to a machine in the work area.  Dep. 13.

8

67.     Schiro alleges that Paul Cowart stated to him that the Sheriff was going to be summoned regarding the sabotage and that there would be a "polygraph taken". Dep. 41.

68.     According to Schiro, the polygraph test, if any, would have been done by the Sheriff's Department so that the culprit could be arrested. Dep. 41-43.

69.     Schiro never took a polygraph test. PC Aff. ¶ 17; Dep. 44.

70.     Schiro, in contradiction of his allegations in the Complaint and Second Amended Complaint, at no time refused to take a polygraph test. Dep. 14, 42.

71.     Neither Jeff Cowart nor Paul Cowart at any time made any statement to Schiro which could have been interpreted or understood as requiring, requesting, suggesting or causing Schiro or any other employee to take a polygraph test. JC Aff. ¶ 5.

72.     Whatever discussion took place between Schiro, Jeff Cowart and Paul Cowart on January 23, 2006 about a hypothetical polygraph test had no bearing on Paula Cowart's decision to discharge Schiro. PC Aff. ¶ 15.

73.     Schiro was discharged by Paula Cowart's letter dated January 27, 2006. PC Aff. ¶ 16 and Exhibit "2".

74.     That letter does not mention the sabotage to the Cutter, or the fact that Paula Cowart believed Schiro had done it, because she had been advised by Southern Printing's payroll service, Gevity Human Resources, that the sabotage should not be mentioned because no witness had seen him do it. Id.

75.     Southern Printing at no time made any effort to cause Schiro to take a polygraph test. PC Aff. ¶ 17.

76.     The decision Southern Printing made affecting Schiro was not based on or in reliance on any fact pertaining to a polygraph test. Id.

9

## MEMORANDUM OF LAW

### I.    Defendants did not discharge Schiro in violation of EPPA.

The prohibitions in EPPA are in 29 U.S.C. §2002. That section is entitled "Prohibitions on Lie Detector Use". The relevant language is: "it shall be unlawful for any employer . . .

    (1)    directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test;

    (2)    to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee;

    (3)    to discharge, discipline, discriminate against in any manner or deny employment or promotion to, or threaten to take any such action against –

        (A)    Any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test, or

        (B)    Any employee or prospective employee on the basis of the results of any lie detector test.

The remaining prohibition, having to do with employees who file complaints under EPPA, is inapplicable.

Schiro's primary claim, and the only one which, if meritorious, would afford him any monetary recovery, is that his discharge was in some fashion based on a polygraph examination that never happened.

Schiro's claims in the Complaint and Amended Complaint that he was discharged because he refused to take a polygraph test are no longer viable, in that he admits that he at no time refused to take a polygraph test. SOF 69. Indeed, after his deposition was taken, he abandoned that claim. His present claim regarding his discharge is nebulous. In paragraph 17 of the Second Amended Complaint he alleges that "[t]he discharge, discipline and discrimination against Plaintiff by the Defendants in retaliation to Defendants' request that Plaintiff take a polygraph examination and Plaintiff not taking a polygraph examination was and is in violation

of 29 U.S.C. §2002(4)." If that allegation is taken literally, it fails because §2002(4) does not apply, being applicable only to situations in which employees are discriminated against as a result of their having filed a complaint under EPPA, testified under EPPA, or exercised a right under EPPA. Assuming, however, that Schiro meant to say §2002(3), which relates to discharge and other adverse personnel action, that also is unavailing. The court is referred to Schiro's sworn testimony at pages 12 and 13 of his deposition.

Q    Okay. Now, what exactly is your claim in this case as to the reason for your discharge?

A    Actually, the reason is the way that everything happened to me with this.

Q    Do you claim in this case that there was any particular motive of Southern Printing in discharging you?

MS. LYTLE: Object to the extent it calls for a legal conclusion.

BY MR. FAWSETT

Q    You may answer.

A    Okay. Ask the question again.

Q    Do you claim in this case --

A    Uh-huh.

Q    -- that Southern Printing had any particular motive for discharging you from employment there?

MS. LYTLE: Same objection.

BY MR. FAWSETT

Q    Okay.

A    I just believe that they believed I did damage to one of their pieces of equipment. And what their motive was for doing that, I don't really know. And – but that led to my ultimate firing.

Q    Do you think that Paula Cowart believed that you had done some damage to a machine?

11

A     Okay. At the time or now?

Q     At the time a decision was made to fire you do you believe at that time she thought you had done damage to a machine in the work area?

A     I believe she did.

Q     Do you think that that's the reason that she fired you?

MS LYTLE: Calls for speculation.

THE WITNESS: I still will answer that?

BY MR. FAWSETT

Q     Yes, sir.

A     I believe that was the reason I was fired.

That testimony conclusively establishes that Schiro's discharge was lawful, in that under settled law, an employee may be discharged for any reason, with or without notice, provided the action does not violate some state or federal law. DeMarco v. Publix Super Markets, Inc., 384 So.2d 1253, 1254 (Fla. 1980). Moreover, Schiro has and can have no basis for disputing items 47 through 64 of the Defendants' Statement of Undisputed Facts. As stated therein, Paula Cowart discharged Schiro partly because she believed that he had committed the sabotage referred to above and partly because she no longer wanted to deal with the complications at work which resulted from Schiro's open, romantic relationship with a female co-worker. SOF 62-63. Paula Cowart's belief that Schiro committed the sabotage was eminently reasonable, in that Schiro had unrestricted access to the workplace at night (SOF 32-34), because there had been some visible and vocal unpleasantness involving him, Channin, and the company on two occasions during the week immediately before the sabotage occurred (SOF 21-31), and because the only other person involved in that unpleasantness, Channin, was out of town on the weekend the sabotage occurred. SOF 35. Schiro's allegations (Dep. 41-44) about the sheriff being called to administer a polygraph test, if relevant to any issue, are irrelevant to the discharge issue because neither Jeff

12

Cowart nor Paul Cowart had authority to discharge Schiro, and because no one but Paula Cowart participated in the decision to discharge him. SOF 59 - 61. Regardless of whether Schiro committed the sabotage, Paula Cowart reasonably believed he had done so (SOF 48-49), Schiro acknowledges that Paula Cowart's belief in that regard was the reason for his discharge (SOF 65-66), and for those reasons whatever, if anything, of legal significance was said about a polygraph examination is irrelevant.

Accordingly, Schiro's claim that he was discharged in violation of EPPA, and that he therefore should be awarded damages, is frivolous. The court is asked to render summary final judgment on that claim.

## II.    Defendants did not commit any violation of EPPA.

Apart from the discharge claim, which, if valid, would be governed by 29 U.S.C. §2002(3), Schiro's only other possible claim for relief is under §2002(1), which provides, among other things, that it is unlawful for an employer "directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test". Schiro asserts at pages 41-44 of his deposition that Paul Cowart and Jeff Cowart or one of them stated that the sheriff was going to be called, a polygraph taken through the sheriff's office, and that whoever had committed the sabotage would be arrested. Schiro stated that he was willing to take such a test, but admitted that such a test was never set up for him or anyone else. Dep. 41-44.

While it has been held that for an employer to request or attempt to require an employee to take a polygraph test is unlawful, despite the fact that no such test occurs (see Polkey v. Transtecs Corporation, 404 F.3d 1264 [11th Cir. 2005]), what was said in the instant case does not reach the level necessary to implicate §2002(1). Neither Paul Cowart nor Jeff Cowart required, requested, suggested or caused Schiro or anyone else, on behalf of Southern Printing, to

13

take or submit to a lie detector test. Instead, at least according to Schiro, they or one of them simply said, during their interview with Schiro, that they were going to call the Sheriff, that a polygraph would be taken by the Sheriff's Department, and that whoever was responsible for the sabotage would be arrested. Dep. 41-44. The circumstances alleged by Schiro in his deposition, if true, bring this case under a recent decision of this Court in Taylor v. Epoc Clinic, Inc., 437 F.Supp. 2d 1323 (M.D. Fla. 2006) ("Taylor"). In Taylor, in contrast to the instant case, the employer admitted in affidavits that its representatives called employees together in connection with an investigation of possible employee wrongdoing and told them that a law enforcement agency was conducting an investigation and as part of that investigation they might be asked to take a lie detector test. (Southern Printing denies here that any discussion of a polygraph occurred.) In Taylor, the plaintiff contradicted the defendant's affidavits by stating that a company representative said that she was conducting her own investigation, as opposed to that of the police, and that a polygraph test would be required. Id. At 1325. Under those circumstances, the court stated that the defendants had "appeared" to violate §2002(1). Id. At 1326. The clear implication of that is that had the evidence been, as it is here, limited to a statement that a law enforcement agency would be called and that it would administer a polygraph examination, there would have been no violation. That is because, if either Jeff or Paul Cowart said what Schiro alleges, it was not a suggestion or other type of requirement on behalf of the employer, but a mere statement of fact about something that never happened. Surely Southern Printing had the right to involve law enforcement in the matter.

For these reasons, Schiro's claims about Jeff and/or Paul Cowart's utterances about a polygraph test, even if true, are irrelevant. No EPPA violation of any kind occurred.

**III.    Defendants are entitled to the limited exemption of 29 U.S.C. §2006(d).**

Section 2006(d) provides a limited exemption in the case of ongoing investigations having to do with such things as theft and industrial sabotage.[2] The exemption is awkwardly worded, in that it is written on the assumption that a polygraph test is administered in all cases. For the exemption to apply, the test must be administered in connection with an ongoing investigation involving some loss or injury to the employer's business, such as "theft, embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage." The exemption also requires that the employee to whom a test is administered have access to the property which is the subject of the investigation, and that the employer have a reasonable suspicion that the employee was involved in the activity being investigated.    The fourth requirement, that the employer execute a certain statement and give it to the examinee before the test, does not apply when no test is actually given. See Taylor, 437 F.Supp. 2d at 1326; Watson v. Drummond Co., 436 F.3d 1310, 1315 (11th Cir. 2006).    Here, there was an ongoing investigation appropriate to the loss, Schiro had access to the property, and Southern Printing had a more than reasonable suspicion that Schiro was involved in the sabotage. SOF 21-57. Thus, regardless of whether Schiro's allegations in his deposition about being told that the sheriff would be conducting a polygraph examination are true, they are irrelevant.

**IV.    Conclusion.**

Based on all of the foregoing, Schiro's claims are without merit, and the Court is respectfully asked to render summary final judgment in favor of Defendants and against Schiro on all claims. The Court is also requested to reserve jurisdiction for an award of attorney's fees, as well as for an award of taxable costs.

---

[2]    To the extent this may be an affirmative defense, Defendants file herewith an uncontested motion for leave to add it to their answer.

15

Respectfully Submitted,

**Mailing Address:**

SHUTTS & BOWEN LLP
Attorneys for Defendants
300 S. Orange Avenue, Suite 1000
Orlando, Florida 32801-5403
**P.O. Box 4956**
**Orlando, Florida 32802-4956**
Telephone: (407) 423-3200
Facsimile: (407) 425-8316

By:   /s/ Charles R. Fawsett
       Charles R. Fawsett, Esq.
       Florida Bar No. 023846
       *cfawsett@shutts-law.com*

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Konstantine E. Pantas, Esq.
Mary E. Lytle, Esq.
E-Mail: *Clerk@pantaslaw.com*

                             /s/ Charles R. Fawsett
                             OF COUNSEL

ORLDOCS 10739396 1