**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MICHAEL SCHIRO,**

         **Plaintiff,**

**-vs-**                                 **Case No.  6:06-cv-279-Orl-31JGG**

**SOUTHERN PRINTING, INC. and PAUL**
**COWART,**

         **Defendants.**

_____

**ORDER**

This matter comes before the Court on Defendants' Motion for Summary Judgment (Doc. 28) and Plaintiff's Response thereto (Doc. 38).

**I. Background**

Plaintiff Michael Schiro ("Schiro") was a full time employee of Southern Printing, Inc., ("SPI") from April 20, 2005, to January 27, 2006. During this time period, Schiro's girlfriend, Tammy Channin ("Channin"), was also employed by SPI. SPI's sole shareholder and President is Paula Cowart ("Paula"). Paula's husband, Jeff Cowart ("Jeff"), and Paula Cowart's father, Paul Cowart ("Paul"), were also employed by SPI during that time period.[1] Most of the employees at SPI, including Schiro and Channin, were given keys to the business so that they could work on evenings and weekends. (Doc. 31 at 7-8; Doc. 29 at 3).[2]

_____

[1]Paula Cowart's maiden and married last names are coincidentally the same. (Doc. 29 at 1).

[2]Doc. 31 refers to Schiro's deposition, and the page numbers cited are the pages of that document – which each contain four pages of the deposition transcript.

During the week of January 16, 2006, SPI was very busy and its employees were under a lot of stress. (Doc. 31 at 6). Channin was under additional stress at the time because her daughter was pregnant and about to give birth in South Carolina. (Doc. 31 at 6). On Thursday of that week, Channin became upset at work because Jeff had taken over her job on a project. (Doc. 31 at 6, 7). Channin felt that she had failed in her job and approached Schiro at work to tell him she was upset. He suggested they take a smoke break together so she could calm down. (Doc. 31 at 6-7).[3] That afternoon, Schiro drove Channin to the airport and she flew to South Carolina to see her daughter. (Doc. 31 at 7).

On Saturday morning, the 21st of January, Schiro received a call from Jeff. (Doc. 31 at 9). Jeff was at SPI and was having difficulty getting a light source to work. (Doc. 31 at 9). During the conversation Jeff indicated that the cutter at SPI was broken as well. (Doc. 31 at 9-10). Later that day, Brian Kempfer ("Kempfer") came to SPI to fix the cutter. (Doc. 29 at 3; Doc. 30 at 1). Kempfer indicated to Jeff that the cutter was not working because two wires inside of it had been "neatly cut". (Doc. 29 at 3; Doc. 30 at 1). Kempfer stated that he could tell the wires were severed intentionally. (Doc. 29 at 3; Doc. 30 at 2).

On Sunday night, Jeff called Schiro and told him to come to work at 9:00 a.m. on Monday morning, two hours later than usual. (Doc. 31 at 10). When Schiro arrived at SPI on Monday

_____

[3]Defendants account of this incident is different, indicating that Channin became "visibly and vocally upset" and Schiro left the work he was doing to become involved in the incident between Jeff and Channin. (Doc. 30 at 2). Defendants also contend that another, similar incident had occurred earlier that same week. Defendants state that Channin was reprimanded by Paula for not finishing a project on time and Schiro again left his work station to intervene. (Doc. 29 at 1-2). However, Schiro does not recall this earlier incident and insists that Channin came to him on Thursday, and he stop working to intervene. At this stage, the Court must view the facts in the light most favorable to the Plaintiff, and therefore, Schiro's version of events must be accepted.

morning, he met with Jeff and Paul in Paula's office. (Doc. 31 at 10).  Jeff produced a set of wires

that had been taped together, and indicated they were the wires from the cutter. (Doc. 31 at 10).

Jeff then told Schiro that the wires had been intentionally cut, and that he thought Schiro had done

it. (Doc. 31 at 10).  Schiro denied any knowledge of the incident. (Doc. 31 at 10).  Paul then told

Schiro that they were going to call in the Sheriff and that a polygraph examination would be taken

to find out if Schiro had done this. (Doc. 31 at 11).  Schiro said that if he had to take a polygraph,

so did all of the other employees. (Doc. 31 at 4, 11).  Jeff then told Schiro to go home and that

neither he nor Channin would be allowed back in the building until either the polygraph

examination had been taken or until everything had been straightened out. (Doc. 31 at 11).

Channin was out of town until Wednesday, and did not plan to return to work until Thursday.

(Doc. 31 at 11-12).

On Tuesday, Schiro called Jeff to ask what was going on, and if he would have to schedule

a polygraph exam. (Doc. 31 at 12).  Jeff backed off the polygraph exam, and told Schiro he would

get back to him. (Doc. 31 at 12, 13). On Wednesday morning Schiro called Jeff again and was told

that he was suspended and should not come back to work until Monday. (Doc. 31 at 12).  Channin

returned to SPI on Friday. (Doc. 31 at 12).  When Channin got out of work on Friday, she handed

Schiro a sealed envelope which contained a letter from Paula to Schiro telling him that he was

fired. (Doc. 31 at 5).  The letter said that Schiro was being terminated because his relationship with

Channin was disruptive to SPI, and that Paula believed that Schiro had sliced the wires on the

cutter. (Doc. 31 at 5).

Schiro brought this suit alleging violations of the Employee Polygraph Protection Act of

1988, as amended, 29 U.S.C. § 2001 *et seq*., (the "EPPA").  In Count I, Schiro alleges that

Defendants violated the EPPA by requesting that he take a polygraph examination. (Doc. 4 at 2). In Count II, Schiro alleges that Defendants violated the EPPA by disciplining and discharging him for refusing to take a polygraph examination. (Doc. 2 at 3).

**II. Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgement points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

## III. Legal Analysis

### A) Count I: The Polygraph Request

"Under the EPPA, it is unlawful for a covered employer to 'directly or indirectly, require, request, suggest, or cause any employee . . . to take or submit to any lie detector test.' 29 U.S.C. § 2002(1)." *Polkey v. Transtecs Corp.*, 404 F.3d 1264, 1267 (11th Cir. 2005). Therefore, an employer can violate the EPPA merely by requesting or suggesting a polygraph examination, even if that examination is never carried out. *Id.* at 1268.

In this case, there is a question of fact as to whether SPI requested or suggested that Schiro take a polygraph examination. Schiro testified that Paul Cowart told him that he would be given one, however, Jeff Cowart insists that the polygraph was Schiro's idea. This is a matter for a jury to decide. However, Defendants argue that, even if SPI did request or suggest a polygraph examination, such conduct was permitted under the "ongoing investigation exception" to the EPPA.

The EPPA's prohibitions do not prohibit a covered employer from requesting a polygraph exam, where the employer demonstrates that: (I) the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business; (ii) the employee had access to the subject of the investigation; (iii) the employer has a reasonable suspicion as to the employee's involvement in the loss; and (iv) the employer provides the employee with a signed written notice that specifically identifies the economic

> loss at issue, indicates that the employee had access to the property being investigated, and describes the basis for the employer's reasonable suspicion. 29 U.S.C. § 2006(d)(1-4). As the statute is phrased in the conjunctive, an employer must comply with each of these requirements for the ongoing investigation exemption to apply.

*Id.* at 1269.

The fourth prong, requiring written notice, only applies in cases where an exam was actually given, so it is inapplicable here. *Id.* at 1269-70.  It is undisputed that the first two prongs of the test have been satisfied: SPI was investigating an incident of sabotage which caused them economic loss, and Schiro did have access to the equipment that was sabotaged.  Therefore, its is only the third prong that is in question: whether SPI had reasonable suspicion that Schiro was involved in the sabotage.

> While the statute does not clarify what constitutes a reasonable suspicion, the regulations define it as an observable, articulable basis in fact which indicates that a particular employee was involved in, or responsible for, an economic loss. Access to the property and potential opportunity, standing alone, cannot constitute reasonable suspicion.

*Id.* at 1270 (internal citations and quotations omitted).

In this case, SPI claims that Paul and Jeff had reasonable suspicion that Schiro had sabotaged the cutter.  In addition to access and opportunity, Jeff and Paula Cowart indicate that the only two employees with any motive were Channin and Schiro, and since Channin was out of town, Schiro was the only reasonable suspect. (Doc. 28 at 12-13).  Apparently, Schiro's motive was that Jeff and Paula had made his girlfriend upset on two occasions during the previous week.  However, there is a question of fact as to whether both of those incidents actually occurred, because Schiro testifies he was only aware of one of them.  Even if both incidents did occur, Schiro could not have been motivated by them without knowledge of them.  Additionally, the parties have different accounts of how those events took place and how upset Channin actually

was.  It will be up to a jury to decide whether Defendants reasonably believed that Schiro had a

motive to sabotage the machine and whether this amounted to reasonable suspicion.  Therefore,

summary judgment is inappropriate with regard to Count I.

> *B) Count II: Retaliation*

Under the EPPA, it is also unlawful for an employer

> to discharge, discipline, discriminate against in any manner, or deny employment or
> promotion to, or threaten to take any such action against –
>> (A) any employee or prospective employee who refuses, declines, or fails to take or
>> submit to any lie detector test, or
>> (B) any employee or prospective employee on the basis of the results of any lie
>> detector test.

29 U.S.C. § 2002(3).

In Count II of Plaintiff's Amended Complaint, Plaintiff alleges that he was discharged and

subjected to discipline "based upon his refusal to take a polygraph examination." (Doc. 4 at 3).

However, Schiro testified that he did not refuse to take a polygraph examination. (Doc. 31 at 4,

11).  Instead, he told his employers that if he had to take a polygraph, all of the other employees

should too. (Doc. 31 at 4, 26).  Moreover, even if Schiro did refuse to take a polygraph, there is no

evidence that Paula Cowart, who made the decision to fire him, was aware of that refusal at the

time she made her decision.  Finally, Schiro stated multiple times in his testimony that he believes

he was fired because Paula Cowart believed that he was responsible for damaging the cutter, not

because he refused to take a polygraph. (Doc. 31 at 4, 18, 23).  Therefore, summary judgment will

be granted with regard to Count II.

**IV. Conclusion**

Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** in part and

**DENIED** in part.  Judgment shall be entered in favor of the **DEFENDANT** with regard to Count

II of Plaintiff's Amended Complaint.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 22, 2007.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party